May, 1797.

The State
vs.
Reed.

The STATE, at the Relation of HINDMAN *et al. vs.* REED.

THE bill filed in this case on the 11th of April, 1791, in the name of the attorney-general of the state, at the relation of *William Hindman, William Perry* and *Gabriel Duvall,* stated, that the defendant in the year 1774, being possessed of part of a tract of land called *Wright's Square,* situate in Queen-Anne's county, and nearly adjacent to the *Manor* in the said county, on the 20th of October, 1774, (setting forth that he had discovered some vacant land adjoining to his part of the said tract) obtained a *special warrant* out of the Lord Proprietary's Land Office, to resurvey his part of the said tract, for the purpose of including the said vacancy. That he procured his said warrant to be executed, and caused a certificate of survey, so by him made, to be returned to the land-office, bearing date the 20th of February, 1775, and called *Wright's Square Corrected.* That in the year 1666, the proprietor of the then Province of Maryland, caused a large body of land, situate and lying on the head of the south-east branch of Chester river, to be surveyed, laid off, and erected into a manor, by the name of *Talbot Manor,* which survey was made, "beginning," &c. and was supposed to contain 6000 acres of land. That at the time the said manor was thus laid off and erected, it was situate in Talbot county; but that as the counties are now established, it is situate in Queen-Anne's county, and adjoining, or nearly adjoining, the said tract of land called *Wright's Square.* That from the time the said manor was so laid off and erected into a manor, it was held by the said Lord Proprietary, and his successors, constantly as a manor, until the return of the said certificate of the survey so made by the said *Reed,* and until he obtained his patent on the said survey, and long after, until the said manor

was laid off into lots, and sold by the state. That from the first granting of the Province of Maryland, until the present State of Maryland was established, the proprietaries of the said province were authorised so to parcel and establish manors by such surveys, and to hold the lands so laid off into manors different from the other lands in the province; and that the tracts so laid off into manors were from time to time demised in parcels to tenants for years or lives, but were not subject, by the rules and regulations of the land-office, to be surveyed on any common warrants, special warrants, or warrants of resurvey, granted out of the said land-office, or to be patented to the persons making such surveys, on any certificate returned on such warrants. That the lands, or any part thereof, so located for manors, could not at any time since the establishment of the government of this state, by any laws or regulations thereof, be surveyed by virtue of any such warrant, or be patented by reason of any certificate returned on such warrants. That the said *Reed* did not obtain a grant upon his said certificate until after the 1st day of June, 1783. That at April session, 1783, the said *Reed* applied to the general assembly, and set forth, that by virtue of a special warrant, and also a *special order* from his excellency *Robert Eden,* Esquire, then Governor of Maryland, directed to the surveyor of Queen-Anne's county, (a) he had surveyed 429 acres of land called *Wright's Square Corrected,* lying in the Reserve of *Queen Anne's Manor,* and had returned a certificate for the same, and had also paid the caution money thereon; which said warrant and order were issued, and the said certificate was returned before the late act of assembly respecting reserved lands; and prayed that the register of the land-office might be directed to issue a patent on the said certificate; and that the general assembly, upon the said application, did by their resolve on the 1st of June 1783, direct the register of the land-office to make out a patent on the said certificate; and that a patent did accordingly issue to the said *Reed* on the said certificate, on the 2d of June, 1783.

That by an act of assembly passed at a session of the general assembly, begun and held at the city of Annapolis on, &c. [May 1781, c 23, s 13,] it was among other things enacted, that the said manor situate in Queen-Anne's county, should be laid off into convenient lots by the commissioners appointed to preserve confiscated

(a) "The surveyor of Queen-Anne's county is hereby directed to return the certificate of the within survey, with a remark of the circumstance of its being within three miles of the manor, for further consideration. 12th March, 1774."

property, and sold on the terms and in the manner di-
rected by the said act; and that afterwards the said
commissioners by virtue of the said act of assembly,
did on the 14th of January, 1782, make sale of the said
manor, or such parts thereof as then remained unsold,
and in particular, on the said day and year last afore-
said, and long before the said grant was made to the
said *Reed*, and before the said *Reed* paid any caution or
composition money on his said certificate and survey,
among other parts of the said manor, the two following
tracts, to wit: Lot No. 10, containing 277 acres, and
Lot No. 13, containing 400 1-4 acres, which were pur-
chased in the name of *James Hindman*, for him the said
*James*, *Clement Hollyday*, and the said *William Hind-
man* and *Gabriel Duvall*; and the said *William Perry*
was by consent admitted and received as a joint purcha-
ser thereof; and the aforesaid *James Hindman* and *Cle-
ment Hollyday*, were released from the said purchase by
consent, and the same thereby became the property of
the said relators. That sometime afterwards a certain
*William B. Carman* was put in possession thereof, and
who now is in possession of the same; and that from
the time of the said purchase the said *W. Hindman,
Perry* and *Duvall*, or those claiming under them, have
been in possession of the said lots, parcels of the said
manor.

That the said *Reed*, by virtue of the said special war-
rant, and the said special order granted by Governor
*Eden*, which only authorised him to survey and add to
his said original tract a certain part of the reserves of
the said manor, did fraudulently and illegally, and to
the injury of the Lord Proprietary of the late Province
of Maryland, include in his said survey so by him
made, a part of the said manor, including a part of the
said two lots, which have been so as aforesaid purchas-
ed by the said relators; and although he well knew that
he had made his said survey so as to include therein a
parcel of the said manor, yet he, the said *Reed*, frau-
dulently did conceal the said circumstance from the said
proprietary, and falsely pretended he had only included
a part of the reserves of the said manor according to
the permission to him granted. That when the said
*Reed* applied to the general assembly, he did falsely
pretend and allege, that his said survey was made ac-
cording to the permission by him obtained, and did
fraudulently conceal that he had included within the
courses of the said certificate, and in his said survey, a
part of the said manor and lands which had actually
been sold under and by the authority and right of the
state as aforesaid to the relators; and by the said false

representations, and fraudulent suppression of the truth, did obtain the said order for a patent, and the said patent pursuant thereto.

That the said relators afterwards discovering that the lines of the lands included within the said *Reed's* patent did include a part of the said two lots by them purchased, did in a friendly manner apply to the said *Reed*, and request him to suffer them peaceably to enjoy the said two lots so by them purchased, &c. but the said *Reed* hath commenced an action of ejectment, in the name of his lessee, against the said *Carman*, who is in possession, &c. for the purpose of recovering, &c. all which actings, &c.

*Prayer*—That the said grant may be vacated and cancelled, so far as the same includes any part of the said manor, or that the said *Reed* may be compelled to release and convey to the relators, or their assigns, all his right and title to such part of the said grant as interferes with and includes the said lots purchased by the relators, or that the said *Reed* may be perpetually enjoined from disturbing the possession of the relators &c. and that such other relief may be granted, &c. Prayer for subpœna and injunction, &c. Which were ordered, &c.

*The defendant*, by his answer, reserving, &c. all benefit of exception to errors, &c. stated, that he admits he was possessed of part of *"Wright's Square,"* and that he obtained a special warrant as set forth, also that the said warrant was executed and a certificate returned as alleged. That he believes in the year 1666, the then proprietary caused a large body of land to be surveyed and erected into a manor, by the name of *" Talbot Manor,"* but knows not to what particular rules of the land office the said manor was subject.

That an application was made to the assembly, and that such resolve was made by the assembly as alleged. That he believes such an act of assembly passed in May 1781, as set forth; and he has heard and believes, that *Clement Hollyday*, in the bill mentioned, and *Gabriel Duvall* one of the relators, were appointed two of the commissioners, and that they undertook to make sale of the said manor, or such parts thereof as then remained unsold, about the time in the bill mentioned, but cannot ascertain the quantities sold, and refers the relators to such proof as they may think proper to produce; but this defendant apprehends, that if such purchase was made as set forth in the bill, the same was illegal and void, being made by persons authorised to sell what they themselves bought.

That he believes if the manor is located as it was deemed formerly to run, that the land included in his

MAY, 1797.

The State
vs.
Reed.

certificate would lie clear of the same; and he conceive'
it would be unjust to subject property to different loca-
tions than those which prevailed at the time it was re-
quired. He refers to his application to the general as-
sembly for the nature thereof, and denies that he had
any design to impose on the said assembly, or the for-
mer proprietary.

He admits such ejectment was commenced, and con-
tends, that by the resolve of the assembly, this court is
precluded from taking cognizance of the matters con-
tained in the relators bill, without that, that there is
any other matter or thing, &c. prays to be dismissed,
&c.

A commission issued, and testimony was taken, and
the manor and lands adjoining were laid down, and a
plot returned, &c.

HANSON, Chancellor—" Whether or not this court
may vacate a patent on the bare ground that the sur-
vey, on which it was granted, contrary to the rules of
the land office, and the directions given by the lord pro-
prietary to his officers, comprehended a part of the land
reserved and appropriated to his peculiar use, by the
name of a Manor, the chancellor is not in the present
case bound to decide. It appears to him, that the de-
fendant having obtained a warrant of resurvey, and a
special order for executing it in the reserves of the ma-
nor, did knowingly exceed the permission granted by
the said order, and comprehend in his survey a consi-
derable part of *Queen Anne's Manor*; that he was, at the
time of making the said survey, and long before, ap-
prized of what was generally deemed the true running
of the third line of the said manor, which line in fact
was intended to be a boundary of his original tract;
that, in consequence of a misrepresentation to the gene-
ral assembly, he obtained that which he could not have
obtained on a fair and full statement of facts; that he
obtained a patent for land, which, agreeably to an act
of the general assembly, had been sold to *James Hind-
man*. In short, it appears that the defendant in his ap-
plication to the said assembly, not only concealed facts,
which, if known, would have defeated his purpose, but
suggested a matter which he knew to be contrary to the
truth. There can be little doubt that a similar sugges-
tion and suppression would be a sufficient foundation
for this court to vacate a conveyance, obtained by one
private person from another; and it is inconsistent with
reason and justice to suppose, that, because the defen-
dant's patent was sanctioned by an act of the legislature,
his title must be clear and indefeasible, and this court is
precluded from an examination of the circumstances

alleged in the bill. The legislature not being constitut- ed for the investigation of facts relative to the rights of individual citizens, or litigations between them, it never can be admitted as a sound principle, " that every alle- gation or matter assumed in a preamble to an act or re- solve of the legislature, shall be considered as incontro- vertible." Besides, if even the legislature may be con- sidered as a tribunal of justice competent to the exa- mination of facts, and a tribunal too from which there is no appeal, it is certainly an universal principle that no man shall be affected or bound by the decision of a court made in a cause to which he was neither privy nor a party.

The only doubtful question in the present case is this —In what manner shall the defendant's legal title in a part of *Queen Anne's Manor* be destroyed? Is his whole patent to be vacated? That would defeat his title in other land which was properly comprehended in his survey. Shall he be decreed to convey or release unto the relators who have purchased the state's right, all his right, title and interest, in lots No. 10 and 13? Against this is an objection which may be perceived by adverting to the defendant's answer.

There never has been a decree of this court, and it would be highly dangerous and improper, to sanction the sale of a trustee to himself or to his own use. Shall then the patent be vacated as to part and stand good for the residue? Has a similar decree ever been passed? Would it not be dangerous and improper (even if it can be done) to vacate in part only a patent obtained by the suppression of truth, and the suggestion of untruth?

Upon the whole, it appears to the chancellor most ex- pedient to oblige the defendant to re-convey to the state that part of the manor which is contained in his grant, and to continue the injunction heretofore issued. By this, both the relators and the defendant will be placed in the condition in which they ought to stand, without injury to any one, and every dangerous precedent so far as may be will be avoided. If the sale made by the commissioners as stated in the bill, be valid, the rela- tors will have grants of lots No 10 and 13; and if in truth the defendant's grant does not run into the manor, he will sustain no loss by executing the deed agreeably to the directions herein contained.

It is thereupon, this 12th day of September 1797, by *A. C. H.* chancellor, and by the authority of this court, adjudged, ordered and decreed, that the injunction here- tofore issued in this cause be perpetual; and that the de- fendant *W. R.* shall by a good deed by him acknowledg- ed, and to be recorded according to law, give, grant,

MAY, 1797.   bargain and sell, release and confirm, unto the *State of*
             *Maryland*, and its assigns, all his the said *Reed's* right,
The State    title, interest and estate, in and to such part of the tract
vs.          of land called " *Wright's Square Corrected*," as is con-
Reed.        tained within the true lines of the tract or body of land
             called " *Queen Anne's Manor*," laid out for 6000 acres.
             And for as much as it appears that the defendant had
             very probable ground for withstanding this suit, at the
             relation of the attorney general, it is decreed that each
             party to this suit bear his own costs."